James H. Boomer, J.
The defendant Wegman’s Food Markets, Inc. moves.to dismiss the complaint against it for failure to state a cause 'of action. Plaintiffs brought this action under the Donnelly Act (General Business Law, art. 22), alleging that the defendant Upstate Milk Cooperative, Inc. established and maintained a monopoly position in a 10-county area in the sale of raw milk and the resale of pasteurized milk, thereby restraining competition in the production, processing and marketing of milk. That monopoly was brought about by Upstate oy the overt acts, among others, of entering into ‘ ‘ agreements, arrangements and combinations” with others, including the' other defendants, of calling meetings .seeking the fixing of prices for the sale of pasteurized milk, coercing competitive dealers to force adherence to plans and programs for price fixing and monopolization, allocating markets, pricing milk on a ‘ ‘ predatory basis ’ ’ for the purpose of weakening and destroying competition, offering rebates to customers of plaintiffs, offering milk for sale to dealers at a price different than that offered to other persons.
The defendant Wegman’s Food Markets, Inc. is charged by the complaint with making “ contracts, agreements and arrangements and combinations with the defendant Upstate Milk Cooperative, Inc. for the purpose of aiding, abetting and furthering the monopoly and restraints of trade complained of, and for the further purpose of injuring the retail competition of Wegman’s Food Markets, Inc.”
The basis of the motion to dismiss, of defendant Wegman’s, is that the Donnelly Act does not apply to the def endant Upstate Milk Cooperative, Inc., a co-operative association of dairymen, nor to ‘ ‘ contracts, agreements or arrangements made ’ ’ by Upstate. Wegman’s argues that since the only acts charged against it are the entering into contracts or agreements and arrangements with Upstate Milk Cooperative, Inc., and since those agreements are exempt from the provisions of the Donnelly Act, the complaint fails to state a cause of action.
In brief, the Donnelly Act provides that ‘ ‘ Every contract, agreement, arrangement or combination whereby a monopoly in the conduct of any business, trade or commerce * * * is or may be established or maintained ”, or whereby competition is or may be restrained or made for that purpose is ‘ ‘ illegal and void.” (General Business Law, § 340, subd. 1.)
The exemption referred to by Wegman’s counsel is found in subdivision 3 of section 340 of the General Business Law: “ 3. The provisions of this article shall not apply to cooperative *311 associations, corporate or otherwise, of farmers, gardeners, or dairymen, including live stock farmers and fruit growers, nor to contract, agreements or arrangements made by such, associations, nor to bona fide labor unions. ’’ (Emphasis supplied:)
Plaintiffs contend that the exemption of subdivision 3 applies only to the formation and existence of a co-operative association and to contracts of the association with its members, not to contracts with those outside of the association. Plaintiffs’ interpretation is contrary not only to the plain language used in subdivision 3 of .section 340, but also to its legislative history.
Subdivision 3 states that1 ‘ the provisions of this article shall not apply to cooperative associations * * * of dairymen ”. (Italics supplied.) This clearly and simply means that the plaintiff cannot apply the provisions of the Donnelly Act (art. 22) to the defendant Upstate, a co-operative association of dairymen; and it cannot, therefore, bring an action against Upstate under the provisions of that act. There is no language in article 22 which in any way leads to the conclusion that a co-operative association of dairymen may be exempt under the Donnelly Act for some purposes and from some acts, but not for other purposes and from other acts. The Legislature has not empowered the courts to determine what acts of a co-operative association violate the act and what do not. It has provided that a co-operative association of dairymen may not be prosecuted nor liable for damages under the Donnelly Act.
And the Legislature has gone further; not only are acts of a co-operative association not illegal under the Donnelly Act, but neither are its “ contracts, agreements or arrangements.’,’ There is no language in the act that permits the courts to say that some of the contracts, agreements or arrangements of a co-operative association are exempt from the act and others are not.
The legislative history of the exemption bears out this interpretation. The exemption accorded to co-operative associations was first added to section 340 of the General Business Law by chapter 490 of the Laws of 1918. It was proposed by a joint legislative committee created to investigate the distribution of dairy products, livestock and poultry (the Wicks Committee). The committee held extensive hearings and wrote a report (N. Y. Sen. Doc., 1917, vol. 14, No. 35) outlining its findings. It determined that dairy production had failed to keep pace with the growth of population (pp. 36-37) and that the State was threatened with the decay of the dairy industry (p. 37). Dairy farmers had not been able to obtain a reasonable price *312 from the sale of their dairy products (p. 38); that the price received was not sufficient to meet the cost of production and return a profit (p. 142). Milk prices were determined not by cost of production, but by the large milk distributors. These distributors yielded to pressures exerted by the consumers who were organized and ignored the needs of the producers, who were not (pp. 290-291). The law of supply and demand had ceased to operate in the milk supply business (p. 295).
Further, the committee found there was an unnecessary duplication of service in the collection and distribution of milk which should be eliminated. ‘1 The only solution possible is to limit and leave only those in the field which the service actually requires. This is just as obvious in the case of milk as it is in gas or any other daily necessity .supplied in small quantity to the consumer.” (p. 579.) The committee recommended that a State department be formed to study the problem and to consolidate and regulate the milk supply business (pp. 579-580).
The committee recognized the need to exempt dairymen’s co-operatives from the prohibition of the Donnelly Act to avoid the repetition of the milk crisis of the winter of 1916-1917 in New York iCity (pp. 336-337). The dissatisfaction of the dairy farmers with the prices paid by the milk distributors led to the organization and growth of the Dairymen’s League. Dairy farmers who became members of the league agreed to sell their milk only to the league and authorize the league to resell. The league in turn attempted to set the price for resale to the dealers. The league fixed a uniform price for the milk for the six-month period from December 1,1916 to March 31, 1917 and the members of the league refused to sell the milk except through the league and at the prices fixed by the league. Many of the milk dealers signed contracts with the league at the prices fixed, but several large distributors refused to deal with the league, and on October 1 the members of the league withheld their milk from the market and a milk crisis developed in New York City. The league officials met with the Mayor of the City and the Mayor was reluctant at first to act as a mediator between the league and the dealers for fear of the Donnelly Act (p. 330). It was not until the District Attorney assured the Mayor that he would not interfere with the negotiations that' the Mayor proceeded to attempt to bring about a settlement (p. 331). The larger dealers, while finally agreeing to the prices fixed by the league, refused to sign contracts for fear of prosecution under the Donnelly Act, but did make a gentleman’s agreement to pay the prices established by the league (p. 333). Thus, the *313 crisis was resolved and the people of New York City were assured of their supply of milk.
The committee approved of the action of the Dairymen’s League, but recognized that the actions of the Dairymen’s League violated the provisions of the Donnelly Act (p. 336). ‘ ‘ The situation was charged with great danger both to the dairy industry and the people of this State. For nearly ten days in New York City two men had with them credentials empowering them to sell and dispose of say 80 per cent of the market milk produced in the State of New York during the winter of 1916-17. The buyers delayed action. They as individuals feared the law, which the dairymen conscious of numbers and strength ignored. ’ ’ (p. 337).
The remedies recommended by the committee were to establish a State Department equipped to study and understand the problems of1 the marketing of milk products and to ‘1 assist the co-operative endeavors of the dairymen ” and, “ to control their action and keep it within the bounds of reason ” (p. 338.), and to permit “ the dealers without fear of the law to have entered into a common negotiation of the purchase of the necessary quantities of the product required by them in their legitimate business, direct from the League without the intervention of jobbers, brokers or speculators of any kind.” (p. 339). The committee concluded that it was preparing legislation, in cooperation with other committees, to accomplish these ends (p. 339).
A joint report of the Wicks Committee, the '.Grovernor’s Market Committee, and >a committee appointed by the Mayor, recommended that a State Board of Foods and Markets be established with broad powers to deal with the question of distribution of foodstuffs (p. 884), and that co-operative agencies for collection, buying and selling óf foodstuffs be permitted. It was recognized that ‘ ‘ without adequate State control, such agencies may lead and have frequently lead to oppression and abuse.” The report continued, “ The State has sought to control, in part, these practices through the operation of the so-called Donnelly Act * * #. But the Donnelly Act is too general in its operation to reach all of the practices complained of, and it is likewise too indecisive as to prevent desirable co-operation through which alone great beneficial economics cán ofttimes be secured. As a practical proposition, the act is unenforceable; as an economic proposition it is wasteful.” (p. 885). The joint report then recited that the committees had been.engaged in preparing a comprehensive bill creating the Department of Agriculture, *314 Foods and Markets with comprehensive power to remedy the unstable condition in the food market (p. 891).
As a result of the report of the Wicks .Committee, the Legislature adopted chapter 490 of the Laws of 1918 which added to section |340 of the 'General Business Law the subdivision that “ The provisions of this article .shall not apply to co-operative associations, corporate or otherwise, of farmers, gardners or dairymen, including live stock farmers and fruit growers, nor to contracts, agreements or arrangements made by such associations.” At the same time the Legislature adopted chapter 655 of the Laws of 1918 adding article 13-A to the Membership Corporations Law. Article 13-A permitted the formation of co-operative agricultural, dairy or horticultural associations, as membership corporations.
The marketing agreements of these co-operative associations were not to be effective until sanctioned by the Department of Farms and Markets (art. 13-A, § 209, as added by L. 1918, ch. 655). In 1922, operators of milk gathering stations were required to ¡be licensed by the Commissioner of1 Farms and Markets and he was authorized to revoke those licenses ‘ ‘ where there have been combinations to fix prices.” (Farms and Markets Law, § 254, as added by L. 1922, ch. 48.) Later, in 1927 licenses were required not only for milk gathering stations, but also for manufactories or plants for the purchase and resale of milk (Agriculture and Markets Law, art. 21, as added by L. 1927, ch. 416). Still later, it was provided by the Agriculture and Markets Law that a license could be also refused or revoked where a milk dealer “ has committed any act injurious to' * * * [public] trade or commerce in demoralization of the price structure of pure milk to such an extent as to interfere with an ample supply thereof”. (Agriculture and Markets Law, § 258-c, subd. [c].)
It thus appears that the Wicks Committee and the Legislature intended that co-operative dairy associations were not to be regulated under the Donnelly Act, but were to be regulated under the Farms and Markets Law, later the Agriculture and Markets Law. Gradually more controls were added affecting the milk industry (see Agriculture and Markets Law, art. 21, entitled “Milk Control”). In 1961, Governor Rockefeller appointed .a Committee on Milk Marketing and in April of 1964 that committee, under the chairmanship of Professor Glenn W. Hedlund, ¡head of the Department of Agricultural Economics at Cornell University, issued its report. Last year the Legislature, following the recommendations of that committee, added *315 to the Agriculture and 'Markets Law new sections outlawing price discrimination, sales below cost, and other unfair methods of competition, in the marketing of fluid milk and fluid milk products (L. 1973, ch. 831).
Plaintiffs ’ counsel cites Federal cases under the Sherman Anti-Trust Act for his proposition that the Donnelly Act does not grant to co-operative agricultural associations complete exemption from its provisions. But the wording of the exemption from the antitrust law contained in the Federal statute is different than that provided by subdivision 3 of section 340 of the General Business Law.
The Sherman Anti-Trust Act provides that ‘ ‘ Every contract, combination in the form or trust or otherwise, or conspiracy; in restraint of trade or commerce among several states or with foreign nations, is declared to be illegal.” (IT. S. Code, tit. 15, § 1.) There was originally no exemption in this act for agricultural co-operatives. In 1914, section 17 was added (U. S. Code, tit. 15, § 17) which states, in part, “ Nothing contained in the antitrust laws shall be construed to forbid the existence and operation ;of labor, agricultural, or horticultural organizations, instituted for purposes of mutual help, and not having capital stock or conducted for profit * * * nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laAvs. ’ ’ Later, in 1922, agricultural co-operative associations were permitted to incorporate (U. S. Code, tit. 7, § 291). Clearly, these sections did not make the Sherman Anti-Trust Act totally inapplicable to agricultural co-operative associations as did the language of the New York State statute. These associations were still amenable to the provisions of the antitrust act. While they could organize, they could not enter into contracts with other persons in restraint of trade (Milk Producers Assn. v. United States, 362 U. S. 458; United States v. Borden CX., 308 U. S. 188). Had the New York 'State legislators meant to give to agricultural co-operative associations only a limited exemption from the Donnelly Act, they could have used the language of section 17 of title 15 of the United States Code. But they chose not to do this and chose instead to provide that “ the provisions of [the Donnelly Act] shall not apply ” to those associations. (General Business Law, § '340, subd. 3.) —■
The plan of the State Legislature was clear, to remove agricultural co-operative associations from the operation of the Donnelly Act and to devise special legislation, under the auspices *316 of a strong Farm and Markets Department, to correct any abuses these associations might create..
Of course, the defendant Wegman’s Food Markets, Inc. is not a co-operative association and it is not exempt from the provisions of the Donnelly Act, But since the only allegation in the complaint against it is that it made contracts and agreements with a co-operative association, and the contracts and agreements of those associations are not illegal under the Donnelly Act, the complaint fails to state a cause of action under the Donnelly Act. This is especially so since allegations of the complaint, insofar as they concern the defendant Wegman’s, are highly conclusory. Stated only is the conclusion that Wegman’s entered into contracts or agreements with Upstate “ for the purpose of aiding, abetting and furthering the monopoly and restraint of trade complained of.” No facts are set forth stating the specific contracts or agreements Wegman’s entered into and the .substance of those contracts or agreements.
I do not mean to say that a cause of action may not be stated against Wegman’s under some law other than the Donnelly Act, nor even under the Donnelly Act if it is based upon more than contracts and agreements with a co-operative association.
Apart from the exemption accorded agricultural co-operative associations and their .contracts, it should be noted that the Appellate Division, First Department, has recently held that price discrimination, one of the acts charged in this complaint, is not, per ¡se, a violation of the Donnelly Act (State of New York v. Mobil Oil Corp., 45 A D 2d 701).
The complaint is dismissed as against the defendant Wegman’s Food Markets, Inc. with leave to the plaintiff to serve an amended complaint within 20 days after the service upon it of an order based upon this memorandum.