Gordon M. Lipetz, J.
This action arises out of the sale of 20 objects of art (oriental jade carvings) by the defendant Hartley Gift Shops, Inc. to the plaintiffs for $67,000.
The complaint sets forth five causes of action, as follows: the first is based upon an alleged conspiracy by the defendants to fraudulently induce plaintiffs to purchase the carvings by misrepresenting their true value; the second is based upon alleged fraudulent misrepresentation of the carvings as being Ming Dynasty jade; the third is for rescission of the purchase agreement as being an oral agreement for the purchase of goods exceeding $500 in value with no memorandum signed by the plaintiffs (Statute of Frauds); the fourth is for $300,000 *3 damages because the price was "unconscionable”; and the fifth is for damages in said sum by reason of the seller’s refusal to accept the return of the goods.
Defendant Hartley Gift Shops, Inc. counterclaims for $18,000, the unpaid balance of the purchase price represented by two postdated checks in the respective amounts of $10,000 and $8,000.
Plaintiffs’ actions against the defendants Astor Art Galleries, Ltd. and Albert Troy were settled and discontinued prior to trial. The only defendants remaining in the litigation are Hartley Gift Shops, Inc. (hereinafter, Hartley), Raymond Levy, Joseph Levy, Stanley Jemal and Pat Jemal. The action was tried before the court, nonjury.
From the testimony adduced, the plaintiffs’ version of the transaction and the events leading up to it is as follows: on August 15, 1973 the plaintiffs, husband and wife, visited the Astor Art Galleries, Ltd. (hereinafter, Astor) in New York City, where they purchased a few Hummel figurines and Wedgewood plates through a salesman, the defendant Stanley Jemal. Payment was made partly by check and partly by credit card. Two days later they returned to take delivery of their purchases. While in the store they purchased through another salesman, Albert Troy, a number of jade carvings for $20,000, paying $2,000 by check with the balance payable on Monday, August 20.
In the early morning of August 20, Mr. Jemal telephoned the plaintiff Harvey Vom Lehn at his home in Huntington, Suffolk County, and made an appointment to meet him in Brooklyn. He and his wife Pat Jemal met with Mr. Vom Lehn as planned, and they went to a restaurant together. Mr. Jemal told Mr. Vom Lehn that he had lost his job because of the sale he made to them, that Astor had defrauded them and that he would like to take him to the Hartley Gift Shop, where finer merchandise was sold, to prove that their carvings were inferior. After luncheon the three drove in Mr. Jemal’s car to the Hartley Gift Shop, a large store on the ground floor of the Hotel Taft. It was a well-established business, having been at that location for 12 years. /
Mr. Jemal there introduced Mr. Vom Lehn to his cousin Raymond Levy, one of the owners of Hartley, at about 1:30 P.M. and described to him the articles purchased at Astor, which were then at the Vom Lehn home in Huntington. Mr. Levy told Mr. Vom Lehn he might have been "taken”, but *4 wanted to see the carvings. He also told Mr. Vom Lehn that he had Ming Dynasty jade for sale, and showed him various carvings for the next three hours. Mr. Vom Lehn said he would like to have his wife see them.
After obtaining Mrs. Vom Lehn’s approval by telephone, Mr. Vom Lehn, Mr. Levy, Mr. and Mrs. Jemal and a helper drove to the Vom Lehn residence in Huntington, arriving there at about 7:00 P.M. Mr. Levy examined the items purchased at Astor and said they were not quality merchandise. When he learned that the Vom Lehns still owed $18,000 on them, he offered to return the items to Astor. His offer was accepted, and Mr. Levy then placed 11 carvings on the dining room table.
Mrs. Vom Lehn testified that Mr. Levy said they were beautiful Ming Dynasty jade and offered to sell the 11 items for $19,000. She and her husband then went upstairs to confer with Mr. and Mrs. Jemal. Mr. Jemal told them he was not an expert on jade but his cousin Mr. Levy was honest and a "wonderful person”. He and his wife cried, told them he had lost his job at Astor, that they had no money, that their children were hungry, and asked them to buy Mr. Levy’s carvings. Upon returning downstairs Mr. Levy said the carvings were priceless Ming Dynasty jade worth 2 or 3 times what he was asking and discussed the individual pieces with them for about a half hour. Plaintiffs then bought the 11 items and Mrs. Vom Lehn gave Mr. Levy her check for $19,000. After having a drink, they all went out to dinner.
Returning to the home about 10:30 or 11:00 P.M., they each had another drink and Mr. Levy told plaintiffs that the objects they had purchased were very good but he wanted to show them something "extra beautiful”. Nine additional carvings were brought in from the car and displayed on the coffee table. Mr. Levy offered to sell the entire group, including the items purchased earlier in the evening, for a total of $67,000. Plaintiffs again went upstairs to confer with Mr. and Mrs. Jemal, and there was a repetition of their first conference. After they returned to the living room Mr. Levy gave them two books on jade entitled "Chinese Jade of Five Centuries” and "Jade: Stone of Heaven”, compared the items on the coffee table with those shown in the books, and praised them highly. He told them the carvings were worth far more than he was asking, but if they purchased them it would save him a trip to Europe.
*5 When the plaintiffs said they did not have sufficient cash on hand Mr. Levy offered to accept a series of postdated checks for the balance. Plaintiffs then bought the entire lot for $67,000 and Mrs. Vom Lehn drew and gave him four checks as follows: $20,000 dated August 29, 1973; $10,000 dated September 15, 1973; $10,000 dated October 1, 1973; and $8,000 dated November 1, 1973. Plaintiffs requested a bill of sale. Mr. Levy said he had not brought a sales book but would have Mr. Jemal bring them a bill of sale and a display cabinet the next day. He then departed with the Jemals and the helper, leaving the carvings with the plaintiffs. Plaintiffs concede that no duress or coercion of any kind was employed by Mr. Levy or the Jemals.
Mr. Levy’s version of the transaction was quite different. He testified that when he displayed the first group of 11 carvings he told plaintiffs they were hand carved Serpentine, a semiprecious stone, but made no mention of any age or period. When they returned to plaintiffs’ home after dinner, he said, plaintiffs asked him if he had anything in jade, and only then did he bring in and display the nine jade carvings. In reply to their questions he described the items as "hand carved Chinese jade of fine quality” and discussed the individual pieces with them for about an hour. He told them such carvings appreciate in value and were a very good investment, but made no mention of their age or said they were of the Ming Dynasty period or any other period. He knew, however, that all the carvings were contemporary, made in the Twentieth Century.
The following day, August 21, Mr. Levy returned the Astor items, as promised, and deposited the $19,000 check, which cleared. On the same day Mr. Jemal delivered to Mrs. Vom Lehn a display cabinet and a bill of sale from Hartley listing the 20 separate items as "vase”, "goddess”, "oxen”, "ginger jar”, etc., without further description, and the amounts and dates of the checks given in payment. Mrs. Vom Lehn accepted same without protest or comment. A week later Mr. Jemal went to work for Hartley as a salesman.
On August 23 plaintiffs drove to the Hartley Gift Shop, where they were introduced to Mr. Levy’s brother Joseph and picked up shelves for the cabinet. However, they placed the carvings in a vault. On August 28 Mrs. Vom Lehn "got a feeling something was wrong”. She became suspicious and visited a jeweler in Huntington, who referred her to Mr. *6 Jacobsen, an art dealer in Cold Spring Harbor. Nevertheless, she telephoned Mr. Levy that day and told him to deposit the $20,000 check dated August 29, 1973. He did so, and the check cleared. She did likewise with respect to the $10,000 check dated September 15, 1973 shortly before it became payable, and that check also cleared. At that point a total of $49,000 had been actually paid to Hartley.
Mrs. Vom Lehn was unable to reach Mr. Jacobsen until September 19, 1973. He referred her to Nathan Doctor, an expert on jade, whom she consulted for an appraisal the next day. After inspecting the items Mr. Doctor referred her to the Gemological Institute, the recognized arbiter of gems and precious stone, and to the District Attorney.
On September 21 plaintiffs took all the items to the Gemological. Institute in New York City, where only three of them were tested. Reports were made that one was "jadeite”, a true jade, and the other two were "serpentine”. Plaintiffs then went to the Hartley Gift Shop and requested an appraisal, stating that they wanted it for insurance purposes but actually intending to take it to the District Attorney. Raymond Levy dictated the appraisal to Joseph Levy, who wrote it in longhand on Hartley’s stationery, listing only 11 of the 20 items and setting forth the appraised value of each, totaling $70,300. Nine items were described therein as "hand carved nephrite jade”, one as "hand carved mutton fat jade” and one merely as a "hand carved translucent incense burner”.
Raymond Levy testified that they requested an appraisal on the jades only. Plaintiffs accepted the appraisal as made, without protest or comment, and made no request that the items be described as Ming Dynasty jade. Later that day they visited the District Attorney and complained that they had been defrauded. The following day, September 22, 1973, they went to Mr. Doctor and requested a formal appraisal of the items. .
Mr. Doctor, the owner of North Shore Art Gallery in Port Washington, has been a dealer in, collector and appraiser of jade and other art objects for 30 years. He testified that jade is the second toughest (most compact) substance in existence, and in hardness it ranks next to diamonds, emeralds, rubies and sapphires. He classified jade as being "nephrite”, which is the hardest variety, white or light colored and the most valuable; "jadeite”, which ranges in colors from white to dark brown and is somewhat less valuable; and "chloromelanite”, *7 which is black, not readily workable, cannot be polished and is infrequently used. All three varieties are stone of such hardness that a steel knife blade cannot scratch it. "Serpentine”, he stated, is a stone whose lesser hardness rarely brings it to the level of true jade, though it is frequently referred to as "Soochow jade”. It is mostly pale green in color, easier to work, more readily available and less valuable. The harder the stone, the greater its value.
For some reason, unexplained, Mr. Doctor examined, tested and appraised only 16 of the plaintiffs’ 20 items. In his opinion, five of them are "nephrite”, five are "jadeite” and six are "serpentine”. He appraised two of the nephrite carvings at $2,000 each and the other three at varying lesser figures; three jadeite carvings at $1,750 each and two at $1,000 each; and the serpentine carvings at various sums ranging from $100 to $300. His total appraisal for the 16 items was $14,575.
Mrs. Vom Lehn stopped payment on the $10,000 check dated October 1, 1973 and on the last check for $8,000 dated November 1, 1973. In October, 1973 she was informed by the District Attorney, after investigation, that no fraud of a criminal nature had been perpetrated. She then consulted an attorney, who instituted this action on December 12, 1973. A few days thereafter he wrote a letter to Hartley on plaintiffs’ behalf rejecting the items purchased for having been fraudulently misrepresented as to quality and value, offering to return them, and demanding the return of the moneys paid.
Plaintiffs’ first cause of action alleges that the defendants entered into a conspiracy to defraud by inducing them to purchase the carvings through false representations as to their true value. As here applicable, a civil conspiracy is an agreement or confederation between two or more persons intentionally participating in the furtherance of a preconceived common plan or purpose to defraud. (8 NY Jur, Conspiracy, § 2; Cooper v Mauer, 37 NYS2d 992; Purofied Down Prods. Corp. v National Assoc. of Bedding Mfrs., 201 Misc 149.) To constitute an actionable conspiracy plaintiffs must establish not only the corrupt agreement between two or more persons, but their intentional participation in the furtherance of the plan or purpose, and resulting damage. (Green v Davies, 182 NY 499; Corris v White, 29 AD2d 470; Ballantine v Ferretti, 28 NYS2d 668.)
However, as the Appellate Division, Second Department, said in Glaser v Kaplan (5 AD2d 829, 830) "The gravamen of a *8 conspiracy is fraud and damage and not the conspiracy. The allegation and proof of a conspiracy are only important to connect a defendant with the acts and declarations of his coconspirators, where otherwise he could not have been implicated (Green v. Davies, 182 N.Y. 499, 504; Brackett v. Griswold, 112 N.Y. 454, 466-467). A conspiracy to commit an actionable wrong is not in itself a cause of action (Moskin v. Lyden, 200 App. Div. 304).” (To the same effect, see 8 NY Jur, Conspiracy, § 13, p 509; Goldstein v Siegel, 19 AD2d 489; Corris v White, 29 AD2d 470, supra.)
No evidence was presented of any agreement to defraud, save what may be inferred from the facts established. "Usually, the only evidence available of a conspiracy to cheat and defraud is that of disconnected acts on the part of the individual conspirators.” (8 NY Jur, Conspiracy, § 13.) While disconnected acts may, when taken together, satisfactorily establish a conspiracy (Keviczky v Lorber, 290 NY 297), the proof before the court fails to do so by a wide margin.
The evidence is far more indicative of an effort by Mr. Jemal to effect retribution against his former employer for having discharged him, and to obtain employment from Hartley, than of an agreement to combine with Raymond Levy to make false representations to the plaintiffs as to the value of the carvings to induce them to purchase same. There is no proof that anyone other than Raymond Levy took part in fixing the price to be charged, and plaintiffs conceded that Mr. Jemal told them he was not an expert on jade. Nor is there any evidence from which it may even be inferred that Mr. Jemal consulted with Mr. Levy outside of the plaintiffs’ presence. Certainly, Mrs. Jemal acted only as a concerned wife whose husband had suddenly become unemployed, and Joseph Levy took no part whatever in inducing or consummating the sale. The first cause of action is therefore dismissed.
The second cause of action is brought to recover compensatory, consequential and punitive damages of $300,000 based upon allegedly false representations knowingly made by the defendants to induce plaintiffs to purchase the carvings. Both plaintiffs testified that Raymond Levy repeatedly described the carvings, the first lot as well as the second, as Ming Dynasty jade. However, it is passing strange that, if that were true, neither Mr. Vom Lehn, an experienced insurance broker 63 years of age, nor Mrs. Vom Lehn, a college graduate well past middle age, would not have questioned the bill of sale, *9 which failed to describe the carvings as being either jade or of the Ming Dynasty period. It is difficult to believe they would have accepted Mr. Levy’s appraisal, which not only failed to list all the items purchased but also failed to describe any of them as being Ming Dynasty jade. That appraisal, it must be remembered, was requested by the plaintiffs for the specific purpose of obtaining evidence on which to base future civil and criminal action. Even more difficult to believe is that Mrs. Vom Lehn would have instructed Mr. Levy to deposit two postdated checks aggregating $30,000 after learning that at least two of the items were indeed serpentine.
On the other hand, Raymond Levy, an experienced dealer in jade for 12 years, categorically denied having misrepresented any item. He testified that the first lot of 11 carvings was described as serpentine, decorative and valuable, and that he discussed the individual pieces with plaintiffs for about a half hour. The second lot he described as jade, which it in fact proved to be, but no period or age was mentioned. Surprisingly, Mr. and Mrs. Jemal, who were present during the entire transaction and are defendants in the action, failed to appear in court to testify. The court may, and does, draw an adverse inference therefrom. (Richardson, Evidence [10th ed], § 92; Noce v Kaufman, 2 NY2d 347, 353.)
Of special significance is Mr. Levy’s appraisal describing each item of jade as being "hand carved”. Mr. Doctor testified that before the advent of power tools and modern abrasives all jade was carved by hand, a tedious process often requiring years to complete a single object. Many fine objects were hand carved during the Ming Dynasty period (1350-1650 A.D.) and are truly works of art and of great value, since they are unique and cannot be duplicated. Contemporary carvings made with power tools, while more elaborate in detail, are not unique and are less valuable. Hand carving, therefore, necessarily implies antiquity and greater value. Mr. Levy’s use of the term "hand carved” tends to weaken the weight of his testimony but does not excuse the plaintiffs’ failure to request a complete description of the carvings in the bill of sale and the appraisal.
The testimony being contradictory, the issue is one of credibility. Considering all the evidence, the court finds the proof equally balanced. Fraud, however, may not be inferred; it must be proved. (Anderson v Malley, 191 App Div 573, 575; Dhooge Bros. v Mecho, 15 AD2d 774.) Plaintiffs have failed to *10 sustain their burden of proving fraud by a fair preponderance of the credible evidence, and accordingly, the second cause of action is dismissed. (Chemical Corn Exch. Bank v Wassung, 8 AD2d 788, affd 7 NY2d 337.)
The third cause of action for rescission of the agreement of sale as being an oral agreement for the sale and purchase of goods exceeding $500 in value, with no memorandum thereof signed by the plaintiffs, was dismissed at the close of the plaintiffs’ case, the absence of a memorandum in writing being merely a defense to an action to enforce an executory contract for the sale of goods. (Uniform Commercial Code, § 2-201, subd [1]). It is not a basis for rescission of an executed contract and completed sale. (Brown v Farmers’ Loan & Trust Co., 117 NY 266; Schenley Distillers Corp. v R. C. Williams & Co., 64 NYS2d 561.)
The fourth cause of action is for compensatory, consequential and punitive damages in the sum of $300,000 because the price was "unconscionable”. Section 2-302 of the Uniform Commercial Code provides that the court may refuse to enforce any contract or portion thereof which it finds, as a matter of law, to have been unconscionable at the time it was made. "Whether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract’s commercial setting, purpose and effect”. (Wilson Trading Corp. v David Ferguson, Ltd., 23 NY 398, 403). No guidelines are laid down in the statute. The Official Comment (McKinney’s Cons Laws of NY, Book 62 V2, Uniform Commercial Code, § 2-302, pp 193-194), however, states: "The principle is one of the prevention of oppression and unfair surprise (Cf. Campbell Soup Co. v. Wentz, 172 F. 2d 80, 3d Cir. 1948) and not of disturbance of allocation of risks because of superior bargaining power.” (See, also, Hume v United States, 132 US 406; Domus Realty Corp. v 3440 Realty Co., 179 Misc 749.)
Mr. Doctor testified that the fair retail value of the 16 items he examined in September, 1973 was $14,750, since appreciated by 20%. Value, he said, is based on the hardness of the stone, color, craftsmanship and topical interest of the carving. No exchange or market place exists where jade and serpentine are bought and sold, though auctions are conducted occasionally at art galleries. He conceded that there are "no infallible or absolute figures”, and that "art is in the eye of the beholder”.
*11 However, even if the value of the objects was double that of Mr. Doctor’s appraisal, the price would still be unconscionable in my view, considering the setting of the transaction. Mr. Levy knew the plaintiffs to be wholly unfamiliar with the quality and value of the items being purchased. To charge them $67,000 for carvings worth less than half that amount is unconscionable.
Nevertheless, section 2-302 of the Uniform Commercial Code merely gives the court the right of refusal to enforce an unconscionable contract. It makes no provision for damages, and none may be recovered thereunder. (Pearson v National Budgeting Systems, 31 AD2d 792.) The fourth cause of action is therefore dismissed.
The fifth cause of action for damages, based upon the defendant Hartley’s refusal to accept the return of the items purchased, was dismissed at the close of the plaintiffs’ case as being duplicitous of the fourth cause of action.
Although all five causes of action have been dismissed, plaintiffs nevertheless have a remedy under the Home Solicitation Sales Act (Personal Property Law, art 10-A). While section 425 thereof states that "the purpose of this act is to afford consumers, subjected to high pressure door-to-door sales tactics, a 'cooling-oiF period”, its applicability is not limited to door-to-door sales. It is made applicable by section 426 to any transaction the subject of which "is primarily for personal, family or household purposes * * * in which payment of the purchase price is deferred over time, and the seller or a person acting for him, is a person doing business who engages in a personal solicitation of a sale and the buyer’s agreement or offer to purchase is made at a place other than the place of business of the seller or a person acting for him.”
Clearly, the transaction was such a sale. Mr. Levy knew the plaintiffs were purchasing the items for use in their home. The purchase price was to be paid in five installments over a 10-week period as evidenced by the issuance of one current and four postdated checks. Mr. Levy, one of the two officers, directors and stockholders of the seller Hartley, was a person in the business of selling carvings and personally solicited the sale at the purchasers’ home, a place other than his own place of business. While section 426 (subd 2, par [a]) expressly excludes such a transaction if made "pursuant to prior negotiations between the parties at a business establishment”, the evidence failed to disclose any prior "negotiations” between *12 Mr. Levy and Mr. Vom Lehn at the Hartley Gift Shop. It demonstrated that Mr. Levy only showed and described various carvings to him over a three-hour period.
Section 427 gives a buyer the right to cancel a home solicitation sale within three days thereafter. However, to gain the benefit of that time limitation the seller was required by section 428 to furnish the buyers with a perforated card specifically advising them of their right to cancel the sale within the three-day period. Since that was not done, the buyers could cancel the sale at any reasonable time thereafter "by notifying the seller in any manner and by any means of [their] intention to cancel” (§ 428, subd 3). Their attorney’s letter to Hartley on their behalf, mailed December 17, 1973 and actually received by Hartley on December 19th, while couched in terms of "rejection” of the purchased items and "repudiation” of the sale, clearly expressed the plaintiffs’ intention not to be bound by the sale and constituted a sufficient cancellation within the meaning of subdivisions (3) and (4) of section 427, and section 428.
Plaintiffs’ complaint was inartistically drawn and failed to state a cause of action under the Home Solicitation Act or even mention same. However, at the close of plaintiffs’ case their attorney moved to conform the pleadings to the proof, which was granted pursuant to CPLR 3025 (subd [c]). Under the direction of CPLR 3026 and the exhortation of the appellate courts that pleadings shall be liberally construed, plaintiffs’ fourth and fifth causes of action, taken together (after being conformed to the proof), will be deemed to have stated a cause of action under the Home Solicitation Sales Act.
Accordingly, judgment is granted in favor of the plaintiffs against the defendant Hartley Gift Shops, Inc. in accordance with article 10-A of the Personal Property Law. Pursuant to subdivision (3) of section 429 they are entitled to recover their down payment of $49,000, plus $100, plus reasonable attorney’s fees and costs. Although plaintiffs have paid their attorney a fee of $7,500, this sum includes services rendered on the causes of action which have been dismissed. For reasonable research, preparation and trial of this action the court awards plaintiffs the sum of $1,500 as attorney’s fees. Subject to their lien on the carvings under subdivision (4) of section 429, plaintiffs will be directed to tender the carvings to said defendant in the same condition as received by them within 30 days after the entry of judgment hereon.
*13 Defendant’s counterclaims for $18,000, the unpaid balance of the purchase price represented by two postdated checks, are dismissed. The price charged being unconscionable, the court will not enforce the contract by requiring the buyers to pay the balance of the purchase price. (Uniform Commercial Code, § 2-302.)