Purofied Down Products Corp. et al., Plaintiffs, *v.* National Association of Bedding Manufacturers et al., Defendants.

Supreme Court, Special Term, Kings County, April 24, 1951.

*Harry Heller* for plaintiffs.

*Harold J. Levin* and *Philip J. Hirsch* for National Association of Bedding Manufacturers and others, defendants.

*Barnet J. Nova* for Irving Buchman, defendant.

*J. C. Crowley* for J. Peter H. Jespersen, defendant.

ARKWRIGHT, J.   The plaintiffs, Purofied Down Products Corp. and Hauptman Feather Company, Inc., both New York corporations, manufacturers and marketers of feather and down pillows, sue for an injunction and for money damages of $1,500,000 as against all the defendants.  The gravamen of their complaint is conspiracy to injure the plaintiffs.

The main defendant is the National Association of Bedding Manufacturers (NABM), an Illinois corporation, licensed to transact business in this State, with an office for the purpose in the city of New York.  The association is national in scope and is some thirty-five years old, claimed to be the oldest association in the industry.

The defendant, Albert S. Roistacher, was and still is an officer and director, and the eastern manager of the defendant, National, as well as being the secretary of a subdivision of the association, known as its "Feather and Pillow Division." The remaining defendants are alleged to be officers and directors of the said division and officers and stockholders of various companies in competition with the plaintiffs. They are also members of NABM.

It appears that between about 1942 and the latter part of 1946, a trade association was in existence, known as the Feather and Down Institute, to which the plaintiffs, or their representatives, and the individual defendants (except Roistacher), representing their respective companies, belonged. This organization was apparently unsuccessful. Its membership dwindled rapidly toward the end of its existence and eventually went over to the defendant, National. Among those members who did, were the plaintiffs' representatives and the individual defendants.

A convention of the defendant National was held in Chicago in November, 1945. As an outgrowth of this meeting, a feather and pillow division of the association was formed. Roistacher was made its executive director. Its office was and is in New York City.

The feather and pillow division, in a general way, was the successor of the declining and later defunct Feather & Down Institute. The latter's members, as they dropped out and joined the defendant National, became eligible to join, and did affiliate themselves with, the said feather and pillow division. The division began its existence in 1946.

The purpose of the feather and pillow division was to assist and benefit the industry.

On the termination of government price controls under the Federal Office of Price Administration, generally referred to as the O.P.A., in August, 1946, it began to be apparent that something had to be done in the industry to eliminate, if possible, or, at least to alleviate, certain abuses that had begun to arise therein as a result of the lifting of the Federal agency's price restrictions. These abuses began to appear in the form of price wars: in unfair competition, in which prices were set greatly below those fairly based on fair standards of merchandising and selling; in misrepresentation; and in the substitution of second-hand, or used, material for new material.

There was no objection in the industry to lower, or low prices, as such. But there was objection, as there should be, among

honest business men, to feather and down merchandise being misrepresented as to its true content and to the defrauding of the public thereby.

At the conclusion of price control, the greatest abuse was in willfully mislabeled merchandise, much of which occurred in so-called promotional sales.

Some of the States had enacted legislation against this practice. New York was among them, with its bedding laws (General Business Law, art. 25-A). Enforcement of these laws generally resided in New York's Labor Department.

In addition, there were Federal enactments and regulations of certain Federal agencies against the practice.

There were practical difficulties, however, in connection with the enforcement of the laws, and the regulations, that rendered the restraint or prosecution of violators immediately ineffectual to prevent the abuses. It was impossible for the proper authorities to police the industry so as to readily detect and apprehend the violators. When the latter were discovered, it took considerable time to bring them to trial and to punish them, if they were found guilty. The offenders, usually corporations, were fined, but the profits that had been secured as a result of the practice of the abuses, made the fines of little or no consequence.

After consideration of the problem, the division decided to institute, for the benefit of the general public and the industry itself, whether of members of National or not, a so-called policing plan. After a preliminary plan, the association's members, in August, 1947, adopted the so-called pillow policing plan. It took effect in October of that year. There was nothing secret about it. Copies of the plan were distributed to the association's members, to government officials, and to others interested.

The plan provided standards for labeling pillows, and, under it, there was put into effect a method for ascertaining and determining whether the contents of pillows, offered for sale, were consonant with their labels.

Generally, two pillows were secured from any lot to be tested. For instance, a department store was having a sale of pillows. Two of them would be secured, usually by purchase, by a member of the association. However, pillows could be sent in for test by the retailer having them on sale, a competitor, or anyone interested. A committee of the division, at least three, met at stated intervals.. The members of the committee were representatives of the members of the association, and were considered experts. The defendant, Roistacher, who had received some instruction

in drawing samples, was always present. All identifications were removed from the pillows to be tested. They were assigned designating numbers known only to Roistacher. Fair samples of the contents were drawn, and put in envelopes. One envelope was forwarded to a chemical analyst, an expert on feathers and down, for chemical analysis in accordance with the bedding law and the labor regulations of the State of New York. The expert selected was so well regarded for his ability and impartiality that these facts were conceded by the plaintiffs, who admitted also that they had employed the same expert in their own businesses for analyses. When the analyst had made his report, the twin sample was opened by the committee. They examined it in the presence of each other, by sight, smell, feeling and other inspection, and with the application of their experience and judgment, gave their opinion as to the contents. When this had been done, the report of the chemical analyst was made known. Usually the two methods employed were in accord. If not, the committee by consensus, made its final determination, as to which should prevail in the particular instance.

The testimony was conclusive that the best results obtainable, as to such determination of content, was by a combination of the above methods.

The plaintiffs have challenged this conclusion, but the court is not in accord with their contention.

In order that the manufacturer's name should not be known, a code number, known only to Roistacher, was assigned to each manufacturer. Thus, the committee did not know whose pillow was being examined, but only knew what the label stated the contents to be.

The plaintiffs claim that collusion and favoritism invaded the committee, and that its determinations were biased and deliberately and knowingly unfair to plaintiffs' prejudice. These assertions find no support in the facts, or the method of the procedure employed, and are unfounded.

It is conceded that an accurate determination of content is a practical impossibility. Likewise, it is conceded that it is impossible to mix down or feathers and fill pillows, etc., properly with a resultant 100% product. Millions of pillows are turned out annually. Even the most competent, honest, and well-intentioned manufacturers, unintentionally or unknowingly, violate good or required standards.

This has been recognized, for instance, by the Labor Department of the State of New York. A variance from standard, referred to as a tolerance, and usually 10%, is therefore permitted.

The committee itself had recognized the necessity of a tolerance, and, for its own purposes, had authorized a greater tolerance than 10%, namely, one of 15%.

When the committee, by majority vote, had determined that a tolerance of more than 15% existed and that mislabeling had occurred, a letter was sent to the retailer of the results of its findings. The manufacturer of the mislabeled pillow was sent a carbon copy of the letter. In no case was the retailer notified unless the chemical analyst's report showed a variance beyond the said 15%.

Both plaintiffs appear to have been cognizant of the institution of the aforesaid feather and pillow division. The second plaintiff, Hauptman, had been invited to be a member repeatedly. He became a member of the association and of the aforesaid division in November, 1947. Puro became a member in January, 1948. They both resigned in January, 1950, each having been so associated with the defendant corporation and the pillow division for about two years. They participated, during these times, in the plan and in its actual operation, just as the other members did. They seek to explain, or excuse their membership and participation, on the ground that they merely wanted to get information and to observe how the plan worked, so that they would be in a position to bring this litigation. That explanation deserves little credence.

The plaintiffs appear to have been persistent violators of the 15% tolerance, and of mislabeling.

That the plaintiff, Purofied, suffered great and irreparable damage finds no great support in the testimony of its own president. The company commenced business in about 1944. In 1944, it manufactured 6,000 pillows a week; in 1950, 30,000 per week. In 1945, it had 36 department stores as customers; in 1950 from 300 to 400. Its gross business in 1944, was $600,000, and it thereafter steadily increased until, in 1950, its gross annual business was $6,125,000.

There is nothing inherently bad in the policing plan itself. It was conceived as a method of overcoming, and preventing, abuses of mislabeling in the feather and down industry. Such a purpose is good, is beneficial to the public, and fosters and encourages honest dealing. When the buying public is protected

by reliable labeling, it has faith and confidence in the merchandise bought. This simplifies ready purchase and promotes the saleability of goods. It is in line with modern and effective selling methods. It stimulates business and makes for dependability as between the seller, whether manufacturer or dealer, on the one hand, and the consuming public, the purchaser, on the other.

Trade organizations that foster and encourage such laudable objectives are to be commended.

The plan, in its operation, has been fairly and impartially administered.

In reporting its findings to those interested, the committee has endeavored to and appears to have rendered truthful and accurate reports or accounts.

The communications directed to those interested, or presumably interested, under such circumstances, could have injured and did injure no one.

It is argued that the above-referred to plan and the acts and conduct of the defendants are in violation of section 340 of the General Business Law of this State.

That section prohibits any agreement, arrangement or combination, with certain exceptions not applicable here, whereby

" A monopoly in the manufacture, production, transportation, marketing or sale in this state of any article or product or service used in the conduct of trade, commerce or manufacture or of any article or commodity of common use is or may be created, established or maintained, or whereby

" Competition or the free exercise of any activity in this state in the manufacture, production, transportation, marketing or sale in this state or in the supply or price of any such article, product, commodity, service, transportation or trade practice is or may be restrained or prevented, or whereby

" For the purpose of creating, establishing, maintaining a monopoly or unlawfully interfering with the free exercise of any activity within this state in the manufacture, production, transportation, marketing or sale of any such article, product, commodity or service, the free pursuit in this state of any lawful business, trade or occupation is or may be restricted, or prevented ".

Now the plan here and its operation neither create nor tend to create a monopoly. Nor do they illegally restrain, prevent or tend to restrain or prevent competition or the free exercise of any activity in this State, or anywhere else, in the manufac-

ture, production, etc., of pillows, feathers or down, or the supply or price thereof. Nor is the free pursuit in this State, or elsewhere, of any lawful business or occupation of the plaintiffs interfered with for monopolistic purposes or for unlawfully interfering with plaintiffs' business or occupation.

The purpose of the section is to prevent restraint of trade and the creation of monopoly so as to protect the general public against enhanced prices of essential commodities by suppression of competition. (*People* v. *Epstean,* 102 Misc. 476; *Matter of Davies,* 168 N. Y. 89; *Nasman* v. *Bank of New York,* 49 N. Y. S. 2d 181.)

The plan and its execution by no fair intendment of purpose, or by its results, effects any such design. Separately or taken together they do not constitute a scheme or combination to prevent competition or to control prices, or to fix prices.

In no sense, do they restrain trade, rather they healthily promote it.

The plaintiffs urge that the plan, as formulated and operated, violates section 580 of the Penal Law of the State of New York.

Subdivision 6 of this section makes it a misdemeanor for two or more persons:

" 6. To commit any act injurious   *   *   *   to trade or commerce ".

The section is framed with conspiracy in mind.

If the defendants were guilty of a conspiracy or of an illegal agreement to violate this section, there is no doubt that an injunction would lie. But all the facts point to an opposite conclusion.

A conspiracy is a combination to do an illegal act by legal means, or any act by illegal means (*People* v. *Klaw,* 55 Misc. 72; *People* v. *Duke,* 19 Misc. 292). And its test is the purpose of the combination. If the object and the means are legal there is no conspiracy, even though a third party may be incidentally injured (*National Fireproofing Co.* v. *Mason Builders' Assn.,* 169 F. 259).

Apart from the above laws, the general attitude of the courts in cases involving unreasonable restraint of trade may be ascertained from litigation arising out of the Sherman Anti-Trust Act. (U. S. Code, tit. 15, § 1 *et seq.*) A co-operative enterprise, free from other objection, but with no monopolistic menace, is not condemned where it would be in mitigation of recognized evils and would foster fair competitive opportunities (*Sugar Institute, Inc.,* v. *United States,* 297 U. S. 553, 598). Likewise,

the application of the statute, in *Appalachian Coals, Inc.*, v. *United States* (288 U. S. 344), was stated to be a question of intent and effect, and that in reaching a determination, economic conditions peculiar to the industry, the practices obtaining, the reasons leading to adoption, the probable consequences of carrying out a plan, and other matters, are to be taken into consideration. The facts found in the latter case were not held to be detrimental to fair competition.

Misbranding is characterized as an evil, affecting the public, and its practice is a proper subject of restraint under applicable Federal statutes. Misbranding goods attracts customers by means of fraud, and trade is diverted from the producer of truthfully marked goods (*Federal Trade Comm.* v. *Winsted Hosiery Co.*, 258 U. S. 483).

After very careful consideration of the instant case, the court is of the opinion, both on the facts and the law, that judgment should be rendered in favor of the defendants, on the merits, with costs. Judgment is, therefore, rendered accordingly.

Submit judgment.