OPINION OF THE COURT
Joseph Di Fede, J.
Defendants, licensed milk dealers, corporate and proprietary, and individuals, directors and sales personnel, collectively move herein in the form of an omnibus motion seeking a wide variety of relief. The application to join herein by defendant Giuliano is granted.
The action is brought by the Attorney-General on behalf of the People of the State of New York pursuant to sections 340, 341 and 347 of article 22 of the General Business Law known popularly as the “Donnelly Anti-Trust Act”. Hereinafter referred to as the “Donnelly Act” for brevity. Section 340 thereof declares to be against public policy, illegal and void:
“[e]very contract, agreement, arrangement or combination whereby
“a monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby
“competition or the free exercise of any activity in the. conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby
“for the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained”.
*423 The Donnelly Act enacted in 1899 is written with a broad legal brush and was designed: “to destroy monopolies in the manufacture, production and sale in this state of commodities in common use, to prevent combinations in restraint of competition in the supply or price of such commodities, or in restraint of the free pursuit of any lawful business, trade or occupation.” (Matter of Davies, 168 NY 89, 101; Matter of Jackson, 57 Misc 1.)
Thus, prevention of restraint of trade and the creation of monopolies and the protection of the public against rigid, increased or, for that matter, artificially lowered prices of essential commodities through the suppression of competition is its objective. (Purofied Down Prods. Corp. v National Assn. of Bedding Mfrs., 201 Misc 149.)
The free and unfettered flow of commerce to permit the economic laws of the marketplace to determine the supply, demand and price of any commodity was the objective behind the enactment of the statute in the first instance.
What the Legislature determined to be against the public’s interest was the combining of dealers in any article in common use to advance the cost of such article by which competition in the supply or price thereof would be restricted; or, stated differently, the object of the statute was the prevention of restraint of trade and the creation of monopoly in articles of trade. The Donnelly Act is the “antitrust statute” of this State.
This indictment herein charges essentially that beginning sometime prior to 1967 and continuing through at least until 1981, the exact dates being unknown, in part within the County of Bronx and in part within other counties of the State of New York, defendants and (unindicted) coconspirators have knowingly and intentionally entered into and engaged in a combination, arrangement and conspiracy in unreasonable restraint of competition, business, trade and commerce, in the distribution of milk in this county and in other parts of the State.
That the substantial terms of the continuing agreement, understanding, reciprocal commitment and concert of action among the defendants and coconspirators is alleged as follows:
*424 “(a) to fix, raise, stabilize, and maintain the wholesale price of milk sold by the defendants and co-conspirators;
“(b) to fix, raise, stabilize and maintain the price of milk sold to consumers by retail customers of defendants and co-conspirators;
“(c) to divide and allocate retail customers among defendants and co-conspirators;
“(d) to restrain each defendant, co-conspirators and other milk dealers from soliciting or competing for retail customers of the other;
“(e) to coerce, persuade and induce retail customers of the defendants, co-conspirators and other milk dealers to fix, raise, stabilize and maintain the price of milk to consumers;
“(f) to coerce, persuade and induce other milk dealers to fix, raise, stabilize and maintain the wholesale price of milk and the price of milk sold to consumers by their retail customers.”
In paragraphs a through f of subdivision 10 of the indictment there is set forth as in furtherance of the alleged “combination, arrangement and conspiracy”, various actions which defendants and the coconspirators allegedly agreed to do and have done. Defendants move under item “5” of this motion to dismiss the indictment on the ground that it is insufficient on its face.
I find, however, that the allegations of the indictment measured against the provisions of section 340 of the General Business Law is legally insufficient on its face and the motion made on this ground is denied.
With respect to item “4” of the defendant’s motion, I find that nothing in the Donnelly Act itself exempts the milk industry as such from its provisions except for subdivision 3 of section 340, which provides that the: “provisions of this article shall not apply to cooperative associations, corporate or otherwise, of farmers, gardeners or dairymen”.
Defendants move under item “4” for dismissal on the ground that the conduct alleged constitutes an agreement with a co-operative association and that such conduct is therefore expressly exempt from the Donnelly Act by its provisions.
*425 The conclusion asserted is not in accord with this court’s interpretation of the co-operative exemption found in cited subdivision 3 of section 340 of the General Business Law.
Defendants strongly urge that because a former indicted defendant, Dairylea Cooperative, Inc., was alleged to have engaged in conduct violative of the Donnelly Act with other defendants, that all named defendants are thereby immunized from prosecution since their cited conduct was with a co-operative.
Although one court found the “cooperative dairymen’s exemption” under subdivision 3 of section 340 all-pervasive and protective of all parties with whom a dairymen’s co-operative may have dealt under that court’s interpretation of the statute (Margrove, Inc. v Up-State Milk Co-op., 79 Misc 2d 309), this court’s interpretation of that section is in accord with that expressed in the case of People v Wisch (58 Misc 2d 766, 771), which held that it was not the legislative intent to give such co-operatives, their officers and employees and third parties with whom they allegedly combined to violate the provision of section 340, license to do so. Rather the exemption was intended to protect and permit dairy co-operative associations and labor unions to function as such without fear that doing so might be viewed as violating the statute. It was not intended to protect carte blanche an act otherwise criminal and outside of that limited area of exemption. The argument made herein that the defendants allegedly having combined with a defendant who is a dairymen’s co-operative association are thereby protected through the stated exemption is rejected.
The Margrove court made no distinction between legal acts of a co-operative and illegal acts. I find the distinction compelling to be made as implicit in the purpose of the statute.
It is therefore concluded and determined that exemption found in subdivision 3 of section 340 relative to co-operative associations is of no avail to defendants and item “4” of this motion is denied.
The issues raised in items “1” and “2” of this motion have proved to be most interesting and have brought forth from *426 both sides stimulating and provocative oral and written advocacy.
The defendants postulate that the provisions of the Agriculture and Markets Law set forth a comprehensive statutory fabric of pervasive regulation of the dairy industry in New York from the farmer to the retailer which was enacted in the wake of the Wick’s Committee Report (NY Senate Doc, 1917, No. 35), which recommended regulation to control the price and supply of milk. A thorough history of the findings of this committee is set forth in Margrove, Inc. v Up-State Milk Co-op. (supra, at pp 311-314). This, argue the defendants, requires the court to conclude that, in the dairy industry, regulation and competitive restriction become the new public policy of the State, rather than the free and unfettered competition intended to be fostered by the Donnelly Act. Succinctly put, the Donnelly Act, the antecedent statute, had failed the milk industry and has been supplanted by the Agriculture and Markets Law in the antitrust field, and conduct in the dairy industry is to be measured, determined, regulated and disciplined administratively by the Commissioner of Agriculture and Markets.
The defendants further argue that the free market approach of the Donnelly Act is legally inappropriate to the dairy industry. They therefore urge dismissal on the theory of “exclusive jurisdiction” or, as a minimum, preliminary referral to the Commissioner of Agriculture and Markets of the matters complained of in the indictments for the application of his expertise, on the theory of “primary jurisdiction” with no further prosecutions of the indictments herein until the conclusion of such administrative action.
The doctrines of “exclusive jurisdiction” (a synonym for administrative pre-emption) and “primary jurisdiction” are a recognized and integral part of the subject of administrative law. Fundamental to these concepts is the established procedural approach that where the Legislature has defined and created an administrative authority to regulate or adjudicate a particular area of the law, the courts should yield its jurisdiction over the particular area so *427 defined and only resume jurisdiction to the extent reserved or permitted by the controlling statutes.
Fundamental to the purpose of defining and creating such administrative jurisdiction is the recognition of the concept that cases in technical fields may not fall within the conventional experience of Judges and juries of laymen and that such cases require the specialized expertise and functional experience of agencies created for the specific purpose of regulating the subject matter, and therefore should not be passed over. Therefore, said the United States Supreme Court in a series of cases: “preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to ágencies that are better equipped than courts by specialization, by insight gained through experience and by more flexible procedure” (Far East Conference v United States, 342 US 570, 574-575) should in the first instance be so referred to the appropriate administrative agency.
“ ‘[T]he courts, while retaining the final authority to expound the statute [i.e., the Sherman Act], should avail themselves of the aid implicit in the agency’s superiority in gathering the relevant facts and in marshaling them into a meaningful pattern ... the holding that the Board had primary jurisdiction, in short, was a device to prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court of the scope and meaning of the statute as applied to those particular circumstances.’ [Maritime Bd. v Isbrandtsen Co., 356 US 481, 498-499.] ***
“The principle is that the courts will not work out an accommodation of antitrust law and regulatory law until they know the agency’s interpretation of the regulatory law.” (Davis, Administrative Law Text [3d ed, 1972], p 380, citing Pan Amer. Airways v United States, 371 US 296.)
The theory so advanced remains viable and the argument raised would be most compelling were it not for the apparent deficiency in performance of the mechanism provided in the very statutes cited to define the standards and specifics of conduct which was intended to be prohibited in the milk industry. It appears that the administrative alternative presently remains incomplete and unavailable to *428 adjudicate the acts complained of in the indictment as violative of any specific rule of conduct or regulation enacted pursuant to the legislative direction mandated to the commission.
This conclusion is compelling from an analysis of the statutory structure of section 258-s of the Agriculture and Markets Law (Dairy Promotion Act), which declares public policy to be as follows: “to preserve competition in the dairy industry * * * to protect the consuming public, producers and the industry against the exploitative use of market and financial power by some buyers where such use violates the above stated objectives; to discourage unfair, uneconomic and destructive trade practices that have been, and are likely to be, carried on in the industry and that tend to have the effect of substantially lessening competition, with the possible result that the quality of products is jeopardized, needed marketing services are likely to be curtailed, innovations and the adoption of more efficient methods of processing and distribution discouraged, or prices arbitrarily determined by a small number of firms when effective competition has been impaired; to prevent the granting or receiving of unjustified price discriminations which would defeat the above recited objectives; to discourage the granting or receiving of unreasonably low prices which would tend to diminish competition and violate accepted principles of ethical business conduct; to provide for prompt and effective legal redress by the public authorities and persons aggrieved by such unfair, uneconomic and destructive practices; to insure that such rules and regulations promulgated to accomplish the above recited objectives shall be in the public interest; and that the intent is to preserve and foster competition in the assembly, processing and distribution of milk and milk products but without the intent to preserve the competitive status quo of individual firms or markets.”
Section 258-t of the Agriculture and Markets Law declares discrimination in price between a milk dealer and his customers to be a violation; section 258-u prohibits the sale, purchase or resale of fluid milk at prices below cost where the purpose thereof is to destroy competition or eliminate a competitor; section 258-v, upon which defen *429 dants have placed strong emphasis, provides: “It shall be a violation of this chapter for a seller or reseller of fluid milk or fluid milk products to engage in unfair methods of competition or deceptive acts or practices.”
Thus stated, these cited statutory pronouncements set forth lofty and laudable objectives for the enhancement of the public good and permit, by outline, areas of operative prohibition in the milk industry. What remains to be done to complete the establishment of the substantive area of administrative jurisdiction is the enactment and promulgation of the specific acts prohibited and restricted under the legislation. The authority to do this is reposed in the Commissioner of Agriculture and Markets under section 258-y, which provides and directs as follows: “the commissioner shall * * * conduct public hearings for the purpose of receiving evidence, pursuant to which he shall issue rules and regulations relative to the definition, specification and publication of acts deemed to be prohibited by the provisions of sections two hundred fifty-eight-t, two hundred fifty-eight-u, two hundred fifty-eight-v and two hundred fifty-eight-w of this article.”
The court has inquired of all counsel, and sought information relative to the extent of implementation of this section by the commissioner. This inquiry reveals that, although empowered to “define, specify and publish those acts deemed to be prohibited by Sections 258-t, -u and v,” he has not done so. A letter from the counsel of the Agriculture and Markets Commission relative to this subject, relates that following the decision of Dairylea Co-op. v Dyson (Supreme Ct, Special Term, Part I, Albany County, Aug. 8, 1975, Williams, J.), in which the court held that the promulgation of the very rules and regulations under these sections was a precondition to any enforcement action, that the department subsequently conducted numerous rule-making conferences and the division of dairy industry services had drafted and revised proposed rules, but that thus far, the department has not promulgated any implementing regulations. Although it is stressed by defendants that the legislation intended the Donnelly Act to be supplanted by these provisions in the context of a regulated industry, at present the administrative struc *430 ture lacks substantive implementation due to the absence of defined, specified and published prohibited acts and conduct in the form of rules and regulations issued by the commissioner pursuant to the cited statutes. The court cannot therefore speculate ex nihilo whether acts which defendants are accused of herein would or would not fall within the parameters of conduct under the Agriculture and Markets Law. What is certain at this time is that the administrative area potentially relevant to this case is presently in vacuo.
Accordingly, that facet of the omnibus motion which seeks to dismiss the indictment on the ground that the Donnelly Act is inapplicable to the conduct specified in the indictment based on the premise of the pattern of extensive regulation of the dairy industry under the Agriculture and Markets Law as well as on the theory of primary jurisdiction is denied.
The court further finds that the conduct as alleged in the indictment and which is set forth in the transcript of the Grand Jury minutes herein is of the class of conduct prohibited by the Donnelly Act.
Item No. 6 of this omnibus motion is a motion pursuant to CPL 210.30, requesting an examination by the court and the defendants of the stenographic minutes and exhibits of the proceedings before the Grand Jury — which resulted in the indictment herein and directing the Attorney-General to make such minutes and exhibits available to defendants and their counsel.
This is joined with the motion under item “7” to dismiss the indictment pursuant to CPL 210.20 (subd 1, par [b]) on the ground that the evidence before the Grand Jury was not legally sufficient to establish the offense charged and, separately, that the Attorney-General did not properly charge the Grand Jury as to the law and evidence.
The application pursuant to CPL 210.30, requesting examination by the defendants of those portions of the stenographic minutes and exhibits to assist the court in making a determination of the motion is denied on the basis that the court finds it does not require the assistance of counsel to determine the motion.
*431 Defendant’s request for a copy of the charge by the Attorney-General to the Grand Jury is, however, granted. The compelling public interest to preserve the secrecy of the evidence should not serve to bar the release of the text of the charge which sets forth the legal principles on which the indictment was found. A copy thereof shall be released under the direction for discovery to lead counsel for defendant, Dell wood Foods, Inc., for reproduction and dissemination to all other counsel.
The court further finds that the charge as given was an adequate and sufficient statement of the law based on the statute and the evidence presented. Protective instructions were also properly given. The motion to dismiss the indictment upon the ground that the Grand Jury was not properly charged as to law and evidence is therefore denied.
The motion pursuant to CPL 210.20 (subd 1, par [b]) addressed to the sufficiency of the evidence to establish the offense charged or any lesser included offense is also denied. However, it is particularly to be noted that the indictment herein alleges in item “8” that the defendants and coconspirators entered into and engaged in a combination, agreement and conspiracy: “beginning some time prior to 1967 and continuing thereafter at least until 1981, the exact date being unknown to the Grand Jurors.”
The minutes and evidence presented before this Grand Jury reveals no evidence of any “combination, arrangement or conspiracy” taking place or existing prior to 1967. The chronology of the evidence in the record herein commences in the year 1979. All testimony by the witnesses who describe the combined dealer action approach to the maintenance of prices of milk at certain retail stores and their concerted action to support such prices and the concerted effort to maintain the supply of milk by specific dealers (defendants and their employees) to specific retail stores is the essence of the monopolistic conduct complained of which, according to the evidence, took place from 1979 until April, 1981. While the indictment alleges the existence of “combination, arrangement and conspiracy” prior to 1979 (the statute specifies “combination, agreement, arrangement and conspiracy”), such allegation will not render the indictment defective per se. On the basis of *432 the evidence before the Grand Jury, the parties are hereby put on notice that at the time of trial, the court will not admit any evidence of any acts or activities alleged to these defendants prior to 1979. In view thereof, the Attorney-General is invited to move orally on the record or on papers pursuant to CPL 200.70 to amend the indictment with respect to this variance in chronology between the indictment and the evidence supporting it. While general release of the minutes of the Grand Jury is not granted, the Attorney-General is also directed to furnish each defendant with a copy of any statement, however obtained, given by a witness who is a defendant herein, and of all statements made by any witness whom the People intend to call as a trial witness.
In addition, copies of the transcript of the testimony of all witnesses who testified before the Grand Jury and who are intended to be called as trial witnesses shall be furnished to each defendant.
The foregoing discovery material shall be furnished no later than four weeks prior to trial.
Item No. 8 herein seeks to dismiss the indictment pursuant to CPL 210.35 upon the ground that the Grand Jury proceedings were defective. This motion is denied. The records of the Grand Jury proceedings herein indicate that the panel was a specially constituted Grand Jury, Attorney-General’s panel, for a six-month period. The period in which it received evidence herein was between February 17 and March 25, 1981. The transcript of attendance furnished the court indicates the presence of a quorum of at least 16 persons on each day it convened and that the same Grand Jury heard the evidence presented as to each defendant indicted.
The transcript gives no indication of a breach in secrecy. No issue under CPL 190.50 (subd 5) has been presented that a defendant or a witness on. behalf of any defendant sought to testify before the Grand Jury and was denied leave to do so.
In the alternative, the defendants move for a bill of particulars (item 8 [1]) and discovery (item 8 [2]). The People have argued herein that the indictment provides *433 ample information to apprise each defendant of the precise nature and character of the crime charged and the time period during which it was carried out. The court, however, finds that while the allegation may satisfy the technical requirements of sufficiency, the complexity of the conduct ascribed to the seven corporate and 20 individual defendants requires further definition to comply with the equally important requirement that a defendant must not be left in ignorance of the substance of the accusation until the time of trial; this is especially so where the indictment itself provides a paucity of information. In such cases the court must be vigilant in safeguarding the defendant’s rights to a bill of particulars and to effective discovery. To do otherwise, a prosecutor “may well run afoul of the defendant’s right to be informed of the accusations against him.” (People v Iannone, 45 NY2d 589, 599.)