OPINION OF THE COURT
Gloria Goldstein, J.
Defendants, 16 corporations and 19 individuals, are charged in a one-count indictment with the crime of combination in restraint of trade and competition in violation of sections 340 and 341 of the New York General Business Law. Defendants are alleged to have participated over a 10-year period in an agreement to fix milk prices and to allocate customers in Kings County.
Indictments alleging similar unlawful agreements among milk companies have been issued by Grand Juries in The Bronx and Queens, and the New York Attorney-General has filed a civil suit in the United States District Court for the Southern District of New York against defendants in these criminal actions seeking treble damages, civil monetary penalties, and an injunction. Defendants in the action before this court have filed a joint omnibus *144 motion to dismiss the indictment on numerous grounds and for discovery and bill of particulars. For the reasons that follow, the motion to dismiss the indictment is denied.
This opinion follows the organization of defendants’joint memorandum of law.
POINT i
In point I, defendants move to dismiss the indictment on the grounds (1) that New York’s antitrust law (General Business Law, § 340 et seq.), commonly known as the Donnelly Act, is inapplicable to the conduct alleged in the indictment and (2) that the New York State Department of Agriculture and Markets has primary jurisdiction over the alleged conduct.
This motion rests on the contention that the New York Legislature has given the Department of Agriculture and Markets, if not exclusive, at least primary jurisdiction over dairy and milk industry activities, including agreements allegedly in restraint of trade. Defendants claim that the unique characteristics of the milk industry — a perishable product, intense competition among distributors, limited retail outlets, and extreme price sensitivity — render the application of the antitrust laws in appropriate. They claim that the Legislature has acknowledged this inapplicability and has implicitly exempted the conduct alleged in this indictment from the proscriptions of the Donnelly Act by subjecting the milk industry to the extensive supervision and regulation of the Department of Agriculture and Markets under a body of law “wholly inconsistent” with general antitrust principles. They argue that because of this. implied exemption this court should dismiss the indictment or, alternatively, stay the prosecution of the action pending a preliminary determination by the Department of Agriculture and Markets of the legality of defendants’ conduct, under the Agriculture and Markets Law.
The Donnelly Act prohibits “[e]very contract, agreement, arrangement or combination whereby * * * [c]om-petition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained” (General Business Law, § 340, subd 1). Like the Federal antitrust *145 laws, the Donnelly Act “represents [a] * * * public policy [of the first magnitude] in favor of free competition for New York.” (Matter of Aimcee Wholesale Corp. [Tomar Prods.], 21 NY2d 621, 626.)
Defendants contend that it is the conflict between this policy of free competition and the policy of regulated competition inherent in the Agriculture and Markets Law which invokes the doctrine of exclusive jurisdiction and exempts defendants from the operation of the Donnelly Act. Yet the same conflict exists in every regulated industry and it is manifest that the mere existence of a regulatory scheme that affects competition does not automatically exempt those regulated from the operation of State and Federal antitrust laws. (See Otter Tail Power Co. v United States, 410 US 366; Silver v New York Stock Exch., 373 US 341; California v Federal Power Comm., 369 US 482; United States v Radio Corp. of Amer., 358 US 334; Georgia v Pennsylvania R. R. Co., 324 US 439; Capital Tel. Co. v Pattersonville Tel. Co., 56 NY2d 11; Columbia Gas of N. Y. v New York State Elec. & Gas Corp., 28 NY2d 117; State of New York v McBride Transp., 56 Misc 2d 90; State of New York v New York Movers Tariff Bur., 48 Misc 2d 225; see, also, 7 Von Kalinowski, Antitrust Laws and Trade Regulation, ch 44A, Exclusive and Primary Jurisdiction: Regulated Industries and the Antitrust Laws; 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices, §§ 190-250, Federal Antitrust Laws: Application to Regulated Industries.)
A court will cede its jurisdiction over an antitrust case to the exclusive jurisdiction of a regulatory agency only when it finds that “its exercise of jurisdiction is so repugnant to the regulatory scheme that the regulatory scheme would be destroyed by virtue of the court’s adjudication.” (7 Von Kalinowski, Antitrust Laws and Trade Regulation, § 44A.01[1]; see Otter Tail Power Co. v United States, 410 US, at p 372; United States v Philadelphia Nat. Bank, 374 US 321, 350-351.) This doctrine of exclusive jurisdiction is invoked rarely, and only where an express substantive exemption in the regulatory statute immunizes the specific activities involved in the antitrust action (see Otter Tail Power Co. v United States, 410 US 366, supra; Hughes Tool *146 Co. v Trans World Airlines, 409 US 363; Minneapolis & St. Louis Ry. Co. v United States, 361 US 173; Georgia v Pennsylvania R.R. Co., 324 US, at p 457) or where the court must imply a legislative intent to immunize the challenged activity in order to make the regulatory scheme work (Silver v New York Stock Exch., 373 US, at p 357; Pan Amer. World Airways v United States, 371 US 296, 305). Courts are very reluctant to imply immunity from the existence of a “ ‘pervasive regulatory scheme’ ”. (See California v Federal Power Comm., 369 US, at p 485; United States v Radio Corp. of Amer., 358 US, at p 350.)
Under the doctrine of primary jurisdiction, the court does not cede its jurisdiction over the case, but merely withholds or postpones action until the regulatory agency has acted. (United States v Philadelphia Nat. Bank, 374 US, at p 353; Capital Tel. Co. v Pattersonville Tel. Co., 56 NY2d, at p 22; see, also, Ricci v Chicago Mercantile Exch., 409 US 289; Carnation Co. v Pacific Westbound Conference, 383 US 213; Federal Mar. Bd. v Isbrandtsen Co., 356 US 481.) This doctrine “requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.” (United States v Philadelphia Nat. Bank, 374 US, at p 353; see Federal Mar. Bd. v Isbrandtsen Co., 356 US, at pp 498-499, supra; Far East Conference v United States, 342 US 570, 574-575.) It is invoked when “(1) defendants’ conduct is arguably immune from antitrust liability under the regulatory statute or (2) the agency has jurisdiction over some of the issues and its decision would help clarify and narrow the antitrust issues.” (7 Von Kalinowski, Antitrust Laws and Trade Regulation, § 44A.01 [2][b].)
A court should not invoke either doctrine if enforcement of the antitrust laws is fully compatible with the administration and enforcement of the regulatory statute. “Where there are two acts upon the same subject, the rule is to give effect to both if possible.” (United States v Borden Co., 308 US 188, 198.)
There is no doubt that New York extensively regulates the milk industry (see Agriculture and Markets Law, art 2, *147 §§ 16, 18, 20, 20-a; art 21, §§ 252-258-r; art 21-A, §§ 258-s — 258-aa), or that the goals of the regulatory system include eliminating destructive competition and stabilizing the milk distribution structure (see Tuscan Dairy Farms v Barber, 45 NY2d 215, app dsmd 439 US 1040; State of New York v Milk Handlers & Processors Assn., 52 Misc 2d 658, 664).
The Legislature has given the Commissioner of Agriculture and Markets authority to grant and revoke milk dealer licenses (Agriculture and Markets Law, § 258-c) and to establish the minimum wholesale price which dealers must pay for raw milk (Agriculture and Markets Law, § 258-m). The commissioner also has authority to subpoena witnesses and documents and to conduct hearings (§§ 22, 254, subd [b]); to enter and inspect places of milk production and sale (§§ 20, 256); to issue orders compelling compliance with the statute or any rules promulgated under it (§36) and to institute actions at law or in equity to enforce compliance with the statute, rules or orders (§ 258-e); to impose penalties and institute court actions to recover the penalties (§§ 35, 39,40,258-e); and to issue cease and desist orders (§ 258-e).
The question, however, is whether this authority creates a regulatory system so incompatible with the provisions of the Donnelly Act that it gives the Department of Agriculture and Markets exclusive or primary jurisdiction over defendants’ alleged agreement in restraint of trade and requires the dismissal or deferral of this indictment. This court finds that it does not.[1]
*148 First, although the Agriculture and Markets Law does expressly exempt some activities from antitrust liability (see, e.g., § 16, subd 7-a; § 258-c, subd [fj; § 258-Z, subd [b]), it does not expressly exempt or authorize agreements among milk distributors to fix retail prices or allocate customers, even when those agreements are entered into to prevent destructive competition. In fact, rather than exempting such agreements and practices, the Agriculture and Markets Law provides the additional sanction of license revocation (§ 258-c, subd [f]).
Second, there is no basis from which this court can imply a legislative intent to supplant the Donnelly Act with the Agriculture and Markets Law. Defendants argue that such an intent is implicit in the conflict between the public policies underlying the two laws. They claim that the policy underlying the Agriculture and Markets Law — “the avoidance of destructive competition and the achievement of a stabilized milk industry” — is antithetical to the policy of “unfettered competition” underlying the Donnelly Act.
Yet, the Agriculture and Markets Law repeatedly affirms the concept of competition in the milk industry, and the express public policy underlying the Dairy Promotion Act (Agriculture and Markets Law, art 21-A, § 258-s et seq.) is “to preserve competition in the dairy industry * * * to discourage unfair * * * trade practices * * * that tend to have the effect of substantially lessening competition * * * [and] to preserve and foster competition in the assembly, processing and distribution of milk and milk products”.
Defendants also argue that the legislative intent to displace the Donnelly Act is implicit in the very enactment of the Dairy Promotion Act. They claim that this law, which provides, inter alia, that price discrimination, sales below cost, and other unfair methods of competition or unfair or deceptive acts or practices are violations of the Agriculture and Markets Law (§§ 258-t, 258-u, 258-v), *149 constitutes a pervasive scheme for regulating competition in the milk industry.
This court agrees with the opinion of Justice Di Fede in People v Dairylea Coop. (114 Misc 2d 421), that until and unless the Commissioner of Agriculture and Markets promulgates rules specifying what conduct constitutes an unfair method of competition or an unfair and deceptive practice, the administration of the Dairy Promotion Act cannot possibly conflict with the Attorney-General’s enforcement of the Donnelly Act.
Since there is no basis for concluding that the Legislature has given the Department of Agriculture and Markets exclusive or primary jurisdiction over agreements in restraint of trade among milk companies, this court will retain jurisdiction over the prosecution of the indictment against defendants.
POINT II
In point II, defendants move to dismiss the indictment on the ground that the Attorney-General has commenced an action for civil penalties in contravention of section 342-a of the General Business Law.
Section 342-a provides that the Attorney-General, “[i]n lieu of any penalty otherwise prescribed for a violation of a provision of [the Donnelly Act] * * * and in addition to an action [for an injunction] * * * may bring an action in the name and in behalf of the people of the state * * * to recover a penalty” for conduct proscribed by the Act.
On April 1, 1981, the Attorney-General filed a civil complaint in the United States District Court for the Southern District of New York charging 11 corporations and 21 individuals, most of whom had been indicted in Bronx County, with violations of the Sherman Antitrust Act (US Code, tit 15, § 1) and the Donnelly Act. (State of New York v Dairylea Coop., 81 Civ 1891.) The complaint, which was amended on January 30, 1982 to include as defendants all the corporations and individuals in the action before this court, alleges multiple conspiracies to fix milk prices and to allocate customers in 11 counties. It seeks an injunction, pursuant to section 16 of the Clayton Act (US Code, tit 15, § 26) and section 342 of the General *150 Business Law; treble damages, pursuant to sections 4 and 4c of the Clayton Act (US Code, tit 15, §§ 15, 15c); and penalties of $100,000 against each individual defendant and $1,000,000 against each corporate defendant, pursuant to section 342-a of the General Business Law.[2]
After having filed the civil complaint, the Attorney-General sought this indictment in Kings County. The crimes charged are punishable by imprisonment of up to four years and by fines of up to $100,000 against each individual defendant and $1,000,000 against each corporate defendant (General Business Law, § 341).
Defendants assert that by authorizing the Attorney-General to bring a civil action for a penalty “[i]n lieu of any [other] penalty”, section 342-a requires an election of remedies. They argue that the simultaneous maintenance of this criminal prosecution and the Federal civil action contravenes this requirement and requires dismissal of the indictment.
The Attorney-General argues that the statute precludes only the recovery of two penalties for the same violation not the maintenance of two actions, and that, in any case, the civil and criminal actions against defendants allege different conduct and are not coterminous.
This court disagrees with both of the Attorney-General’s contentions. Clearly, despite the 11-county scope of the conspiracies alleged in the civil complaint, the same or very similar activities gave rise to both actions. Moreover, case law and the language and legislative history of section 342-a indicate that the statute gives the Attorney-General an alternative, not an additional remedy. (People v Gold Medal Farms, 113 Misc 2d 574; see, also, People v Haberstrumpf, 93 Misc 2d 963; People v Texaco, Inc., 82 Misc 2d 698.)
On the other hand, the court disagrees with defendants’ assertion that the indictment must be dismissed because the Attorney-General has pursued and maintained two actions simultaneously against defendants. Neither the Donnelly Act nor the Criminal Procedure Law contem *151 plates such a consequence. Section 342-a gives the Attorney-General a choice: he can proceed with this prosecution and voluntarily dismiss the penalty claims in the civil complaint or he can withdraw the criminal charges pending against defendants in this court and proceed with the civil action as filed.
If the Attorney-General fails to exercise this choice within 10 days of the date of this decision and order, the court will dismiss the indictment in the interests of justice on the ground that defendants cannot be made to defend against the same allegations in two actions — one civil and one criminal — when ultimately, as even the Attorney-General acknowledges, only one penalty can be imposed.
POINT III
In point III, defendants move to dismiss the indictment on the ground that defendants’ alleged conduct constitutes an agreement with a dairy co-operative association and is therefore expressly exempt from the operation of the Donnelly Act. The “co-operative exemption” oh which defendants rely provides: “The provisions of this article shall not apply to cooperative associations, corporate or otherwise, of farmers, gardeners, or dairymen, including live stock farmers and fruit growers, nor to contracts, agreements or arrangements made by such associations, nor to bona fide labor unions.” (General Business Law, § 340, subd 3.)
Several courts in this State have addressed the question of the scope of this exemption as it applies to dairy cooperatives. The New York County Supreme Court, in People v Wisch (58 Misc 2d 766, 771), held that the exemption is limited in scope and was intended not to immunize all activities but only “to protect unions and co-operatives and their officers and employees from the claim that by their very formation they were violating [the Donnelly Act]”. Justice Di Fede followed People u Wisch in deciding the defendants’ omnibus motion in the Bronx action against milk dealers (People v Dairylea Coop., 114 Misc 2d 421, supra).
The rule in the Fourth Department is contrary. There, the Appellate Division affirmed the opinion of the Monroe County Supreme Court that subdivision 3 of section 340 of *152 the General Business Law creates the broadest possible exemption, immunizing from civil and criminal antitrust liability not only all acts, agreements, and arrangements, regardless of their purpose, in which a dairy co-operative engages, but also any non-co-operative party to such agreements. (Margrove Inc. v Upstate Milk Coop., 79 Misc 2d 309, affd sub nom. Margrove Inc. v Wegman’s Food Markets, 49 AD2d 669; see, also, State of New York v Glen & Mohawk Milk Assn., 114 Misc 2d 363; but see Barns v Dairymen’s League Co-op. Assn., 220 App Div 624 [non-cooperative parties to agreements are not exempt].)
Numerous considerations persuade this court that the Margrove decision is incorrect and that the New York Legislature, like the Federal Congress, intended to exempt from the operation of the antitrust laws only legitimate activities and agreements undertaken to organize and operate the co-operative association and to further the collective sales and marketing of members’ products (see Maryland & Virginia Milk Producers Assn. v United States, 362 US 458; United States v Borden Co., 308 US 188, supra [dairy co-operatives are not exempt from the operation of the Sherman and Clayton Acts]).
As was noted above, repeals of legislation by implication are strongly disfavored (Georgia v Pennsylvania R.R. Co., 324 US, at pp 456-457; United States v Borden Co., 308 US, at p 198, supra). The Margrove rule that co-operative and non-co-operative parties to agreements in restraint of trade are exempt from the operation of the Donnelly Act potentially repeals that law as it applies to New York’s agricultural industries. It leads logically to the conclusion that the members of any conspiracy to violate the antitrust laws can immunize themselves from all consequences under these laws by including one agricultural co-operative in their arrangement. Defendants make exactly this claim: they contend that the participation of Dairylea Cooperative, Inc., immunizes all 16 corporations and 19 individuals alleged to have conspired to fix prices and allocate customers in Kings County over a 10-year period.
This claim is too extreme to rest solely on the wording of one provision, particularly when the history of that provi *153 sion strongly indicates that the Legislature intended to create a more limited exemption.
The legislative session which added the co-operative exemption to the Donnelly Act in 1918 (L 1918, ch 490) also amended section 582 of the Penal Law to exempt certain activities of agricultural co-operatives from criminal liability under the conspiracy law (L1918, ch 491). The Penal Law co-operative exemption was carefully defined and circumscribed. It stated: “[associations, corporate or otherwise, of farmers, gardeners or dairymen * * * engaged in making collective sales or marketing for its [sic] members or shareholders of farm, orchard or dairy products produced by its members or shareholders are not conspiracies. Contracts, agreements, arrangements or combinations heretofore or hereafter made by such associations or the members, officers or directors thereof in making such collective sales and marketing and prescribing the terms and conditions thereof are not conspiracies and they shall not be construed to be injurious to trade or commerce.” (Penal Law, § 582, as amd by L 1918, ch 491; emphasis added.)
This court cannot conclude that the 1918 Legislature intended to exempt all the activities of agricultural cooperatives from civil antitrust liability under the Donnelly Act, but only the collective sales and marketing activities of co-operatives from criminal antitrust liability under the conspiracy section of the Penal Law. It is more likely that the Legislature intended chapters 490 and 491 of the Laws of 1918 to be read together to create an exemption reflective of the needs of New York’s dairy and agriculture industries at the time.
Dairy farmers in New York, like those in other States, had begun to organize in the early 1900’s in order to strengthen their bargaining power with milk distributors and to obtain better prices. (See Barns v Dairymen’s League Co-op. Assn., 220 App Div, at pp 628-629.) In 1916, the Dairymen’s League, the association of New York dairy farmers, began to pool members’ milk and to sell it collectively at a set price (Margrove Inc. v Upstate Milk Coop., 79 Misc 2d 309, 312, supra). Member farmers agreed to sell only through the league and at the set price. When several *154 large distributors refused to sign purchase contracts with the league for fear of prosecution under the Donnelly Act, league members withheld their milk from the New York City market and a milk crisis developed. (Margrove Inc. v Upstate Milk Coop., supra.) A legislative committee was established to study the problems in New York’s milk industry (the Wicks Committee) and as a result of its report (NY Senate Document, 1917, vol 14, No. 35), the 1918 Legislature enacted laws authorizing the formation of agricultural and dairy co-operative associations as membership organizations (L 1918, ch 655); providing that the marketing agreements of such associations would not be effective until sanctioned by the Department of Farms and Markets (L 1918, ch 655); and exempting such associations and their contracts and agreements from the provisions of the Donnelly Act (L 1918, ch 490) and the Penal Law (L 1918, ch 491). (79 Misc 2d, at pp 313-314.)
The Margrove court found in this history a legislative intent “to remove agricultural co-operative associations [entirely] from the operation of the Donnelly Act and to devise special legislation, under the auspices of a strong Farm and Markets Department, to correct any abuses these associations might create.” (Margrove Inc. v Upstate Milk Coop., 79 Misc 2d, at pp 315-316.) It appears to this court that this history indicates a more limited intent: to remove only the collective sales and marketing activities and agreements of co-operative associations from the proscriptions of the State’s antitrust laws.
Dairy co-operatives were established as a mechanism for collective sales and marketing of members’ milk. The 1916 milk crisis developed because milk distributors refused to sign collective sales contracts with the Dairymen’s League. The Legislature expressly gave the Department of Farms and Markets approval authority, not over every activity but only over the collective sales and marketing agreements of co-operative associations. The Legislature expressly exempted from the operation of the conspiracy law only collective sales and marketing activities and agreements.
Nothing in these facts supports the conclusion that the 1918 Legislature intended to immunize all activities of co *155 operative associations from all antitrust liability. Instead, despite the broad wording of chapter 490, these facts indicate an intent to displace the antitrust laws only insofar as they would interfere with the legitimate efforts of dairy cooperatives to sell pooled milk at fixed prices and on fixed terms.
At least two sections of the Agriculture and Markets Law reinforce this conclusion. Subdivision 7-a of section 16 expressly exempts conferences of dairy producer co-operatives or agreements resulting from such conferences, if approved by the commissioner, from antitrust liability. Subdivision (f) of section 258-c, which authorizes the commissioner to revoke or suspend dealer licenses, expressly excludes from its definition of unlawful conspiracy or combination in restraint of trade, “[a] co-operative association of dairymen [legally] organized * * * and engaged in making collective sales or marketing for its members or shareholders of dairy products produced by its members or shareholders”. The Legislature would not have enacted these specific exemptions if the Donnelly Act had been wholly inapplicable to dairy co-operatives since 1918.
Since the agreement alleged in the indictment does not involve the collective sales and marketing efforts of a dairy co-operative, the co-operative exemption in the Donnelly Act does not provide a basis for dismissing the indictment against defendants.
POINT IV
In point IV, defendants move to dismiss the indictment pursuant to CPL 210.20 on the ground that the indictment is insufficient on its face.
An indictment must contain: “A plain and concise factual statement in each count which, without allegations of an evidentiary nature * * * asserts facts supporting every element of the offense charged and the defendant’s or defendants’ commission thereof with sufficient precision to clearly apprise the defendant or defendants of the conduct which is the subject of the accusation” (CPL 200.50, subd 7).
The indictment in this case conforms to this statutory requirement. The only element of the crime charged is *156 making or attempting to make or enter into a combination or agreement that restrains or may restrain competition or trade (General Business Law, §§ 340, 341). No overt act is required (People v Rosenberg, 93 Misc 2d 965).
The indictment charges defendants with “knowingly and intentionally * * * [entering into and engaging in] a contract, agreement, arrangement and combination in unreasonable restraint of competition and * * * trade * * * in violation of General Business Law §§ 340 and 341”. It specifies the nature and purpose of the combination as an ongoing agreement to fix the retail price of milk, to induce others to fix the retail price of milk, to allocate customers, and to restrain competition for customers. It alleges that, in order to effect their ongoing unlawful agreement, defendants (a) discussed at meetings and in telephone conversations the retail price to be set for milk, (b) exchanged assurances that they would not solicit each other’s customers, (c) co-operated in enforcing the agreement and in inducing retailers to maintain the set milk price, (d) harassed and intimidated retailers, and (e) established sanctions for taking another’s customers. And it alleges that the agreement resulted in higher, fixed, noncompetitive retail milk prices and restricted competition among milk dealers in the distribution and sale of milk.
Although defendants must have more specific information in order to prepare for trial, the charges and allegations set forth in the indictment are sufficiently precise to apprise them of the conduct which is the subject of the accusation against them.
POINTS V AND VIII
In points V and VIII, defendants move, pursuant to GPL 210.20 (subd 1, par [b]) and 210.30 to inspect the Grand Jury minutes and to dismiss the indictment on the ground that the evidence before the Grand Jury was not legally sufficient to establish the commission of the alleged conspiracy and each defendant’s participation in that conspiracy. In addition, defendants urge the court to direct the Attorney-General to release the Grand Jury minutes to them so that they can assist the court in determining these motions.
*157 Although this court believes that ordinarily every defendant should have the opportunity at the pretrial motion stage to inspect the Grand Jury minutes supporting his indictment, the law is not in accord with that belief. A court may release Grand Jury minutes only where, “after examining the minutes, [it] finds that release of the minutes, or certain portions thereof, to the parties is necessary to assist the court in making its determination on the motion [to dismiss the indictment] * * * Provided, however, such release shall be limited to that grand jury testimony which is relevant to a determination of whether the evidence before the grand jury was legally sufficient to support a charge or charges contained in such indictment.” (GPL 210.30, subd 3.)
Since this court has been able to decide defendants’ motions on the basis of its reading of the Grand Jury minutes without the assistance of defense counsel, it is not permitted to direct the release of those minutes to defendants.
The Grand Jury that issued this indictment heard testimony that salesmen for and in some cases officers of the corporations named as defendants, in order to maintain uniform prices throughout various Brooklyn neighborhoods, regularly agreed, at meetings and in telephone conversations, on the price at which retail stores in those neighborhoods would sell milk. The Grand Jury also heard testimony that the salesmen abided by an agreement not to solicit each other’s customers and not to serve another’s customer, even at the customer’s request. Finally, the Grand Jury heard testimony that the salesmen imposed these agreements on retail stores by threatening to stop milk deliveries, and that the result of such pressure was the maintenance of a uniform milk price and a reluctance by store owners to switch milk dealers.
Whether or not the rule of reason applies to price fixing and customer allocation under New York law (see discussion under point VI, infra), the Grand Jury had before it sufficient competent and admissible evidence to establish the existence of a continuing agreement in unreasonable restraint of trade and each individual and corporate defen *158 dant’s participation in that agreement (see CPL 190.65, subd 1; Penal Law, §§ 20.20, 20.25).
The Grand Jury also had before it a considerable amount of opinion evidence, conclusory evidence, hearsay, and testimony elicited through the most flagrant use of leading questions.
The prosecutor who appears before a Grand Jury has the very serious responsibility of maintaining, in the absence of an adversary or a Judge, the legality and fairness integral to all criminal justice proceedings. As legal ad-visor to the Grand Jury, he of she is expressly responsible for ruling on the admissibility of evidence and instructing the jury on the significance, legal effect, or evaluation of evidence (CPL 190.30, subds 5, 6; General Business Law, § 347).
• The prosecutors in this case failed, to a surprising degree, to fulfill these responsibilities. The incompetent and inadmissible testimony which they allow the Grand Jury to hear without any limiting instructions and which they sometimes even elicited comes dangerously close to having prejudiced the jury and impaired the integrity of the proceedings (see United States v Estepa, 471 F2d 1132; People v Cunningham, 88 Misc 2d 1065, 1081-1082; People v Percy, 74 Misc 2d 522, 532-533, mod 45 AD2d 284, affd 38 NY2d 806). This court has not seen, in hundreds of sets of Grand Jury minutes, such disregard for the constraints the law imposes on questions and answers in legal proceedings.
Nonetheless, since the Grand Jury minutes disclose that the Grand Jury had before it legally sufficient, competent and admissible evidence, obtained by permissible questions and answers, to establish a prima facie case against each defendant, the indictment may not be dismissed (People v Avant, 33 NY2d 265, 271).
POINT VI
In point VI, defendants move to dismiss the indictment pursuant to CPL 210.35 on the ground that the Grand Jury proceedings were defective. Defendants claim that the Attorney-General failed to present exculpatory evidence and to charge the Grand Jury adequately on the law, that a *159 quorum of grand jurors did not hear all the evidence as to all defendants, and that the grand jurors were biased because as consumers of milk, they are victims of the alleged conspiracy and have an economic stake in the outcome of the case.
Apart from the failure of the Assistant Attorney-General to apply the rules of evidence rigorously to the testimony presented to the Grand Jury, the proceedings were properly conducted. Nothing in the record supports defendants’ speculations that the grand jurors’ status as consumers and possible exposure to media reports about the milk industry rendered them unable to abide by their oath to be impartial. There is no defect in the Attorney-General’s failure to present, as exculpatory evidence, information on industry regulations and official statistics indicating variations in milk prices. If the prosecutor has any duty to present exculpatory evidence (see People v Perez, 105 Misc 2d 845), that duty would not require presentation of evidence which at best supports the defense that defendants’ activities were reasonable.
The court is satisfied that the statutory quorum requirements for voting were met. The court’s examination of the Grand Jury attendance record disclosed that a quorum of grand jurors was present on every day that evidence was presented, that more than a quorum voted, and that at least 12 of those who voted to indict heard all the “critical and essential” evidence against all defendants. In addition, the Grand Jury minutes indicate that the Assistant Attorney-General properly instructed the Grand Jury on the quorum requirements for voting and indicated the names of the grand jurors who, in her opinion, were not entitled to vote (see People v Colebut, 86 Misc 2d 729, 735). Defendant’s request for disclosure of Grand Jury attendance records is denied.
Finally, this court finds no error in the Assistant Attorney-General’s instructions that an agreement to fix, raise, or maintain prices, or to allocate customers, or to restrict the customers to which any distributor may sell, is, without more, an unreasonable restraint of trade which violates the Donnelly Act.
*160 The Donnelly Act, like the Sherman Act, proscribes only unreasonable restraints of trade (Standard Oil Co. v United States, 221 US 1; New York Clothing Mfrs.’ Exch. v Textile Finishers Assn., 238 App Div 444, 452). Under Federal law, some activities, including agreements among competitors to fix prices and allocate markets, are so inherently anticompetitive that they are considered illegal per se (United States v Topco Assoc., 405 US 596; Northern Pacific Ry. Co. v United States, 356 US 1; United States v Socony-Vacuum Oil Co., 310 US 150). The effect of this characterization is that the court may not inquire into the reasonableness of the prices set by the agreement (United States v Socony-Vacuum Oil Co., 310 US, at p 226, n 59, supra; United States v Trenton Potteries Co., 273 US 392). In other words, “the reasonableness of the restraint is not an issue and evidence as to the reasonableness of the restraint is inadmissible.” (54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices, § 331, p 851.)
Activities that are not considered illegal per se are subject to “rule of reason” analysis, according to which the court must determine whether the restraint imposed promotes competition or suppresses and destroys competition (Chicago Bd. of Trade v United States, 246 US 231, 238). In making this determination, the court considers such factors as the peculiar characteristics of the business, the nature and effect of the restraint, and the reason for its adoption. (Chicago Bd. of Trade v United States, supra.)
The New York Court of Appeals has not addressed the question of whether price fixing and customer allocation agreements are illegal per se under the Donnelly Act. Two Appellate Division decisions apply rule of reason analysis to these constraints (New York Clothing Mfrs.’ Exch. v Textile Finishers Assn., 238 App Div 444, supra; Barns v Dairymen’s League Co-op. Assn., 220 App Div 624, supra), but both decisions considerably predate the Supreme Court’s formulation of the per se doctrine in 1940 in United States v Socony-Vacuum Oil Co. (310 US 150, supra) and both misconstrue the Supreme Court precedent upon which they expressly rely (Maroney, Antitrust in “The Empire State”, 19 Syracuse L Rev 820, 835-839). A third *161 Appellate Division decision, rendered in 1941, adopts a per se approach to a price fixing agreement on the authority of United States v Socony-Vacuum (Manhattan Stor. & Warehouse Co. v Movers & Warehousemen's Assn. of Greater N.Y., 262 App Div 332, 334-335, revd on other grounds 289 NY 82). New York Supreme Court decisions are inconsistent (cf. People v Wisch, 58 Misc 2d 766, 768 [price fixing agreements are per se unreasonable and unlawful under the Donnelly Act], with State of New York v Milk Handlers & Processors Assn., 52 Misc 2d 658, 666 [the rule of reason should be applied in interpreting the Donnelly Act]).
While “[a] Federal decision contrary in principle is not binding upon a State court in respect of a State statute or of a domestic doctrine not involving a Federal question” (Marsich v Eastman Kodak Co., 244 App Div 295, 296, affd 269 NY 621), this court finds nothing in State court decisions to contradict the Supreme Court’s reasoning that agreements among competitors to fix prices and allocate customers have such a “pernicious effect on competition and [such a] lack of any redeeming virtue [that they] are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.” (Northern Pacific Ry. Co. v United States, 356 US, at p 5.) Therefore, the Assistant Attorney-General had no duty to instruct the Grand Jury on the rule of reason or to advise it to consider the peculiar characteristics of the milk industry and the actual effects of defendants’ conduct on competition.
POINT VII
In point VII, defendants move to dismiss the indictment against 11 of the corporate defendants on the ground that their indictment in both Brooklyn and Queens[3] violates these defendants’ guarantee against double jeopardy and constitutes harassment in violation of their due process rights.
These claims have no merit. Jeopardy has not attached to any defendant since neither the Brooklyn nor Queens prosecution has proceeded to the trial stage (see *162 CPL 40.30, subd 1, par [b]). Moreover, the indictments issued in Brooklyn, Queens, and The Bronx allege different agreements, different activities, and different participants. No due process right protects a defendant from being indicted and prosecuted in different counties for separate crimes allegedly committed in those counties.
At the hearing on this motion defendants offered the additional argument that the indictment must be dismissed because the Department of Agriculture and Markets turned over confidential documents to the Attorney-General in violation of section 23 of the Agriculture and Markets Law. This court has read those documents in camera and finds that the information they contain was not presented to the Grand Jury or in any way used to obtain this indictment. The Attorney-General’s possession of these documents is no basis for dismissal.
[Portions of opinion omitted for purposes of publication.]

. This conclusion conforms with the view of the Commissioner of Agriculture and Markets that:
“|T]he Milk Control Law [article 21 of the Agriculture and Markets Law] vests in the Commissioner * * * broad authority to supervise and regulate various aspects of the milk industry, but nothing in the law provides regulated parties with a blanket exemption from any other provisions of state law such as the Donnolly [sz'cl Act * * *
“The application of the price fixing provisions of the Donnolly [sz'cl Act to agreements between agricultural cooperatives and other parties which are not such cooperatives has never conflicted with the administration of the Milk Control Law.
“The practical construction placed upon the Agriculture and Markets Law by this Department has always been based upon the principle that the Agriculture and Markets Law did not preempt or otherwise exclude application of the Donnolly [sz'c] Act to illegal price fixing by agricultural cooperatives.” *148 (Affidavit of J. Roger Barber, Commissioner of Agriculture and Markets, dated Jan. 23, 1981, submitted to Supreme Ct, Rockland County, in Dairylea Co-op. v Attorney General, Index No. 127/1981, attached to People’s memorandum of law as Exhibit C.)

. The proceedings in this action were stayed on August 31,1981 pending disposition of defendants’ omnibus motion to dismiss the Bronx County indictment.

. Dellwood Foods was indicted in The Bronx as well.